IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 20-cv-03615

TATYANA SMITH,

    Plaintiff,

vs.

OFFICE OF THE ATTORNEY GENERAL,
Colorado Dept. of Law; and FELICE HAAS,

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Tatyana Smith, by her attorney, Robert M. Liechty, Esq., of ROBERT M LIECHTY PC, brings her complaint as follows:

1.    Plaintiff Tatyana Smith resides in Aurora, Colorado. She worked as a senior paralegal for defendant Office of the Attorney General from October 7, 2019, through March 3, 2020.

2.    Defendant Felice Haas is a senior Assistant Attorney General in the Office of the Attorney General. Ms. Smith primarily reported to Ms. Haas. Ms. Smith claims that Ms. Haas (1) discriminated against her and (2) retaliated against her for engaging in protected activity. Ms. Smith claims that Ms. Haas discriminated against her because she is Black and she is Christian and that she retaliated against Ms. Smith because Ms. Smith complained of this discrimination. Ms. Smith claims that under the cat's-paw theory, Ms. Haas's supervisors accepted her discriminatory and retaliatory conduct

without serious question, thereby imputing such discriminatory and retaliatory animus to the office.

3.     Ms. Smith brings her claims of discrimination and retaliation under Title VII and under Colorado's Anti-Discrimination Act, CRS §24-34-402(a) and (e).  Therefore, jurisdiction is proper in this court under 42 USC §1331.  Venue is also proper.

4.     Ms. Smith has exhausted her administrative remedies.  She filed a charge of discrimination and retaliation with the EEOC and received a right to sue letter on September 23, 2020.  She filed a charge with the Colorado Civil Rights Division which issued a No Probable Cause Opinion on October 6, 2020.  Ms. Smith has timely filed her claims in this court.

5.     Ms. Smith had worked as a paralegal, prior to her employment with the State of Colorado, for eight years.  Most recently, she had worked as a paralegal for the Adams County District Attorney's Office for 4½ years.

6.     On October 7, 2019, she began work in the Department of Law's Nursing and Professional Boards Unit.  She was assigned to work under Felice Haas, but also did work for other assistant attorney generals, such as Amy Meiburg (who did most of her training), Ashley Carter (who was new as of January, 2020), and Keenan Lorenz.  Ms. Smith also occasionally worked for the Accountancy Professional Boards Unit with Mr. Lorenz.

7.     Ms. Haas was on vacation when Ms. Smith began working on October 7.  Ms. Haas returned from vacation approximately the end of October, but had little

contact with Ms. Smith for the first few weeks because Ms. Haas was attending to other projects upon her return from vacation.

8. The supervisor for Ms. Haas was John Roberts. Mr. Roberts and Ms. Haas had worked for a long time together and were close. Mr. Robert's supervisor was Christopher Beall, the deputy in charge of the Business and Licensing Unit.

9. In October-November, 2019, while Ms. Haas was still on vacation and upon approval from Mr. Roberts, Ms. Smith implemented an Outlook task list for the Unit. Previously, attorneys and staff kept track of tasks and deadlines on sticky notes.

10. Prior to Ms. Haas's return from vacation, Ms. Smith had no performance issues with Ms. Meiberg, Mr. Lorenz, or John Roberts.

11. One or two weeks after returning from vacation, in early November in one of their first communications, Ms. Haas yelled at Ms. Smith for implementing this task-list change, which had occurred while Ms. Haas was gone. The administrative manager, Maria Ruiz, overheard the yelling and reported Ms. Haas's conduct to Ms. Haas's supervisor, John Roberts. However, because Ms. Haas and Mr. Roberts were good friends, nothing happened to Ms. Haas.

12. Shortly after this, Ms. Haas saw that Ms. Smith had a scripture calendar above her desk in her cubicle. Ms. Haas made a dismissive comment about the calendar under her voice and walked away.

13. In the third week of November, Ms. Haas called Ms. Smith "stupid" to Ms. Meiberg, which comment Ms. Smith overheard. Ms. Haas criticized Ms. Smith to Ms. Meiberg because Ms. Smith had asked opposing counsel for a complete document, with

the signature page, as opposed to just asking for the signature page alone.  Two days later Ms. Meiberg apologized to Ms. Smith for taking part in this conversation with Ms. Haas.

14.     Ms. Smith met for a few minutes with the supervising attorney, John Roberts, and the administrative manager, Maria Ruiz, about Ms. Haas's yelling at Ms. Smith, but no change occurred in Ms. Haas's conduct.  Mr. Roberts did apologize for Ms. Haas's conduct.

15.     On December 27, 2019, Ms. Haas sent an e-mail to Ms. Smith regarding the whereabouts of Peer Assistant Services (PAS) records.  The PAS employee had sent an explanation to Ms. Smith that the documents would be sent shortly.  Rather than directly answering Ms. Haas's e-mail, Ms. Smith forwarded to Ms. Haas the e-mail that she had received from the PAS employee.

16.     Ms. Haas marched to Ms. Smith's desk to degrade her for forwarding the e-mail rather than separately answering Ms. Haas's e-mail.  Ms. Haas was talking so loudly, and so close to Ms. Smith, that she was spitting in Ms. Smith's face.  She yelled "Don't forward me emails with the chain – just answer my e-mail.  I don't understand you people.  What's up with your face?  Why does your face look like that?  Are you stupid?"  Ms. Haas then stormed away.

17.     This tirade was so abusive that a nearby staff member, Shannon Coggins, who was new to the unit, asked, "Who was that?"  She reported the incident to Ms. Ruiz.

18. In the first week of January, 2020, Ms. Smith met with Mr. Roberts about this December 27 incident and Mr. Roberts said that both he and Mr. Beall would speak to Ms. Haas about the incident.  Ms. Haas's behavior did not change.

19. Shortly later, Ms. Smith and Ms. Coggins met with Mr. Beall to further discuss the incident.  Ms. Coggins said that she was surprised that Ms. Smith did not quit that day, December 27.  She also said that this was not the first time that she had heard Ms. Haas degrade Ms. Smith.  Mr. Beall asked Ms. Smith why she, herself, did not report the incident.  Ms. Smith told him that she did not report the December incident because, when she reported the November incident in ¶11 above, nothing improved.

20. Brent Kelly, an assistant attorney general for the Dental Board, asked Ms. Smith to speak privately with him in his office.  He said "I know what's going on.  You're being isolated.  I stand with you as a Christian and you're not the only one who knows that Felice Haas doesn't like you."

21. Over the next several weeks, Ms. Haas manufactured a case for the termination of Ms. Smith, discussed below.

22. On January 28, 2020, Ms. Smith met with Mr. Roberts and Mr. Beall to conduct her first 90-day progress review.  The review reflected poorly on Ms. Smith because performance issues had been manufactured against her by Ms. Haas.  The three discussed mostly Ms. Smith's problems in working for Ms. Haas.  None of the incidents in the paragraphs below, which were later summoned to justify Ms. Smith's termination, were discussed in this January meeting.

23. On February 27, 2020, Mr. Beall made the decision to terminate Ms. Smith based upon a manufactured poor performance. He handed Ms. Smith a termination letter on that date, but said she had two days to determine whether she would resign. If she resigned, the office would write a recommendation letter for her. She did not resign. Her termination was effective March 2, 2020.

24. Ms. Smith appealed her termination through the state personnel board, but lost the appeal. In the appeal proceedings, the State produced a six-page outline of Ms. Smith's purported performance issues justifying her termination. The following paragraphs outline these purported performance issues and show why the issues are either minor or not true.

25. The State's list starts with a discussion that John Roberts purportedly had with Ms. Smith on November 18, 2019, shortly after the first incident between Ms. Smith and Ms. Haas referenced in ¶ 11 above. On this day, Mr. Roberts told Ms. Smith that she had finished her training – until that time, she had been shadowing another paralegal. In its chronology, the State represented that in this meeting Mr. Roberts told Ms. Smith that she had missed deadlines, that she was not informing attorneys of missed deadlines, that documents were not filed timely, that documents were filed incorrectly, and that documents were filled with errors. If this were true, which was not the case, those errors would be the fault of the paralegal that Ms. Smith was shadowing. That is, until November 18, Ms. Smith did no tasks on her own. Furthermore, no one told Ms. Smith that she was making such mistakes as they were occurring.

26.     The State also said that on November 18, Mr. Roberts told Ms. Smith that she had failed to timely add documents to ProLaw, a program in which the attorneys and paralegals save their documents.  That was not true.  Everyone in the office was new to ProLaw and everyone, attorneys included, were trying to figure out how best to use it.

27.     The State also said that on November 18 Mr. Roberts told Ms. Smith  that she failed to attend to details and that she did not forward documents to attorneys.  The two did not discuss this topic on November 18 except for the fact that Ms. Smith was the only paralegal who had a part-time legal secretary and, therefore, had to do the legal secretary's work also.  This sometimes included forwarding documents to attorneys.

28.     Instead of discussing the above, most of the November 18 meeting was spent discussing the difficulty Ms. Smith had in working with Ms. Haas.

29.     The second item on the State's list was a discussion with Keenan Lorenz (an assistant attorney general), John Roberts, and Ms. Smith that occurred on November 21, 2019.  In that meeting, Mr. Lorenz did talk about how he wanted documents saved in ProLaw because he, working with the Accounting Board, did things differently than the attorneys working with the Nursing Board.

30.     However, they did not talk about an untimely filing of a notice of deposition cancellation or filing a joint motion to continue.  Mr. Lorenz did tell Ms. Smith that "I want you to feel comfortable in asking me more questions."

31.     The State then represented that on December 2, 2019, Amy Meiberg (an assistant attorney general), apparently criticized Ms. Smith for failing to send pleadings

7

to the court and for failing to file discovery in ProLaw.  This is nonsensical because they filed no pleadings in the court; rather, they filed pleadings with the Administrative Law Judge's clerk.  Nor did they file discovery in ProLaw; rather, they saved discovery in ProLaw.  At any rate, Ms. Meiberg brought up no performance issues with Ms. Smith on December 2.

32. On December 5, 2019, the State claims that Ms. Haas reported that Ms. Smith had put one return date on a subpoena and a different return date on the cover letter for that subpoena.  Ms. Haas also reported that Ms. Smith did not review the subpoenas before they were sent.  Ms. Haas stated that she explained the subpoena-return process to Ms. Smith.  These subpoenas were subpoenas for medical records.  Ms. Haas herself changed the return date on the subpoenas without changing the return date on the cover letters and a secretary, Donna Martinez, sent the subpoenas, with their cover letters, without reviewing the dates.  Thus, Ms. Smith had nothing to do with the change of the return date nor the mailing of the subpoenas.  Ms. Haas did not explain the subpoena return process to Ms. Smith, as she alleged in the chronology.

33. The State alleges that, also on December 5, 2019, Ms. Meiberg discussed with Ms. Smith that Ms. Smith missed four redactions in the *McBroom* case.  No such conversation occurred.  In addition, this discovery involved the production of 4,000 pages of medical records.  Both Ms. Smith and another paralegal, Doreen Ramos, did the redactions, and there was no way of knowing who missed the four redactions.

34. The State next alleges that on December 6, 2019, Ms. Meiberg claims that she discussed with Ms. Smith an incorrect setting date entered on a notice of charge.

This conversation could not have occurred on December 6 because Ms. Smith was on a 6:46 am flight to Washington DC that day. Nor did this conversation occur on a different date. Furthermore, the paralegals get a setting date from the Administrative Law Judge's clerk and then provide the date to the assistant attorney general to see if it is clear.

35. The next performance issue allegedly occurred on December 30, 2019, concerning the lack of communication regarding documents from PAS (Peer Assistance Services). As stated above in ¶¶ 15 and 16, this purported lack of communication began with Ms. Smith forwarding the e-mail from the PAS employee to Ms. Haas rather than independently responding to the e-mail from Ms. Haas regarding the whereabouts of the PAS documents. This occurred on December 27, not on December 30. Furthermore, the fact that this is cited as a "lack of communication" shows how poor the communication from the State is – it makes no mention of the fact that the so-called miscommunication was forwarding the exact information the attorney wanted to the attorney. Nor did the State mention that Ms. Coggins reported Ms. Haas's abuse of Ms. Smith on that day. Such an oversight is poor communication, indeed, but not on Ms. Smith's part.

36. The State says that the next incident occurred on January 3, 2020. Ms. Meiberg said that Ms. Smith made two mistakes in drafting a motion for continuance: (1) that it should have been based on the unavailability of an expert witness and (2) that the certification should have said that Respondent took no position on the motion, as opposed to Respondent did not oppose the motion. There is no basis for this complaint

9

against Ms. Smith because the only time she drafted a motion for continuance regarding the unavailability of an expert witness was in February, 2020, not in January.

37. The next purported performance issue occurred on Monday, January 6, 2020. On that date, Mr. Lorenz asked Ms. Smith to draft a notice of charge in an accountancy case. The State claimed that Ms. Smith neither sent Mr. Lorenz a draft nor asked for additional time by close of business on Friday and that Mr. Lorenz completed the notice of charge himself. That is not true. On Monday, Ms. Smith immediately returned an e-mail to Mr. Lorenz asking when they could meet. On Thursday, she then asked if she could have until the end of the day to finish it. She emailed him a draft on the following Friday morning, January 10.

38. On January 7, 2020, the State claims that Ms. Smith did not respond to a request to proofread and file a motion in the *Zachary* case. That is incorrect. Ms. Smith proofread and filed the motion on January 7.

39. On January 9, 2020, the State claims that Ms. Smith failed to proofread and file a motion for default and proposed initial decision in the *Guerra* case. Instead, she asked an administrative assistant, Jason, to file it for her. The date on this is wrong because Jason only filed one document for Ms. Smith, which he filed on February 3, 2020. He filed the February 3 document without any name on the certificate of service, but that was his decision. Besides his error with the certificate of service, there was no other mistake with this filing.

40. Also on January 9, a Thursday, the State claims that Mr. Lorenz asked Ms. Smith to file a motion in the *Yobst* case by Friday afternoon. Ms. Smith discovered

that Mr. Lorenz had cited an incorrect statute in the motion and sent him a message – he was working from home that Friday. Upon learning of his mistake, he said he wanted to wait until Monday to file it and either Ms. Smith or paralegal Doreen Ramos will filed it on that Monday, January 13.

41. On January 10, 2020, the State claims that Ms. Meiberg told Ms. Smith to send records to an expert in the *Whitney* case. Ms. Smith recalls confirming with Ms. Meiberg about to whom she should send the records. Ms. Smith is unaware of any performance issue in seeking this confirmation.

42. On January 13, the State claims that John Roberts discussed the above issues referenced in ¶¶ 37-40 with Ms. Smith. That is incorrect; they only talked about the *Yobst* case referenced in ¶ 40. Ms. Smith does recall stating that she felt "defeated" in her relationship with Ms. Haas because Ms. Haas treated her so poorly, but this would not constitute a performance issue on Ms. Smith's part.

43. On January 22, the State claims that Mr. Roberts asked Ms. Smith to file an answer brief in the *Heinle* case. Another paralegal, Doreen Ramos, had already "coded" the brief and it was ready to file. The State claims that Ms. Smith did not know bluebook-citation procedures, did not follow instructions from paralegal Coggins, and demonstrated that she did not remember prior directions from Ms. Coggins. This is incorrect. Ms. Smith knew the bluebook-citation procedures. Ms. Coggins gave no instructions to Ms. Smith; rather, it was Ms. Ramos, who had prepared the brief, who gave instructions on how to file it. There was no performance issue involved in this incident.

44. On January 24, the State claims that Ms. Meiberg asked Ms. Smith to proofread a notice of charges in the *Long-Romero* case. The State claims that Ms. Smith missed a handful of errors and that she was told that in the future she was to proofread to ensure that the allegations were correct and that they make sense to the reader. In her proofreading, Ms. Smith did not miss any errors and has no idea how this allegation contains a performance issue.

45. On January 28, 2020, the State claims that Chris Beall and John Roberts met with Ms. Smith about her purported unsatisfactory performance. Ms. Smith agrees that they had this meeting, but that almost all the performance issues they discussed related to incidents between Ms. Smith and Ms. Haas.

46. On February 3, the State claims that Ms. Haas told Ms. Smith that she was inputting information in the wrong blanks on the Open Matter form for the *Norris* case. This is also incorrect. An Open Matter form is the form in ProLaw used to open a case in the office, which was Donna Martinez's job, not Ms. Smith's job. Furthermore, the issue regarding this case was how the information came to the office from the Department of Regulatory Agencies. There was no issue regarding an incorrect data entry.

47. On February 5, 2020, the State claims that Ms. Smith mistakenly drafted a notice of charge without a certificate of service in the *Ziegler* case. This is incorrect. The certificate of service is always added to the notice of charge after the draft is approved.

48. On February 6, the State claims that Ashley Carter, a new assistant attorney general, told Ms. Smith that a subpoena had a return date that differed from the return date in the cover letter for the subpoena. She also allegedly told Ms. Smith that three subpoenas were not saved in the ProLaw "subpoenas" folder. However, both of these tasks were done by Donna Martinez and do not constitute a performance issue on Ms. Smith's part.

49. On February 7, the State claims that Ms. Meiberg told Ms. Smith that she made her third certificate-of-service mistake. This alleged third mistake, in the *Long-Romero* case, occurred because Ms. Meiberg told Ms. Smith that there were only two, not three, opposing counsel. Ms. Smith is unaware of the other two certificate-of-service mistakes.

50. On February 10, the State claims that Ms. Smith neglected to reserve a conference room in the *Long-Romero* case. That is incorrect. The conference rooms are reserved by the legal secretaries, such as Ms. Martinez. Ms. Meiberg asked Ms. Smith if the conference room had been reserved. Ms. Smith walked to Ms. Martinez's desk to confirm that it was reserved and e-mailed that information back to Ms. Meiberg. This was not a performance issue.

51. On February 19, the State claims that Ms. Smith had an incorrect address on the certificate of service for a notice of charge in the *Tenorio* case. It also claims that Ms. Haas, not Ms. Smith, put the wrong case number on the notice of filing, which Ms. Smith failed to correct so that the filing was rejected. In fact, Ms. Smith discovered that the Respondent had a current address not updated with the nursing board. Ms. Smith

13

spoke to Ms. Haas about this and Ms. Haas amended the certificate of service to include the current address, but Ms. Haas added the wrong case number.  The filing was ultimately accepted when Ms. Haas's mistake was corrected.  The only possible performance issue by Ms. Smith was her failure to catch Ms. Haas's mistake.

52. On February 26, 2020, the State claims that Ms. Smith scheduled a deposition in Ohio for the wrong date.  That is incorrect; the date was not scheduled until it was cleared with the Ohio court reporter, which required a different day than the originally-requested date.

53. The above purported performance issues in ¶¶ 25-52 above did not justify Ms. Smith's termination.

### *First Claim – Racial Discrimination against the Office*

54. The motivating factor for Ms. Smith's termination was her race or her religion.  The final decisionmaker relied upon biased information and did not do an independent investigation to determine if this information was correct.  Her termination violates Title VII, 42 USC §2000e-2(a)(1) and CRS §24-34-402(1)(a).

55. Ms. Smith has been damaged by loss of income, emotional pain-and-suffering, humiliation, and inconvenience.  Defendant intentionally discriminated against Ms. Smith and she is entitled to compensation for these losses under 42 USC §1981A(b) and §24-34-405(3).

56. Ms. Smith is entitled to her attorney's fees and costs pursuant to §2000e-5(k) and §24-34-405(5).

### *Second Claim – Retaliation against the Office*
### *for Complaining of Racial and Religious Discrimination*

57. A concurrent or independent motivating factor for Ms. Smith's termination was to retaliate against her complaints that Ms. Haas was racially are religiously discriminating against her. The final decisionmaker relied upon biased information and did not do an independent investigation to determine if this information was correct. This violates 42 USC §2000e-3 and §24-34-402(1)(e)(IV).

58. Ms. Smith has been damaged by loss of income, emotional pain-and-suffering, humiliation, and inconvenience. Defendant intentionally discriminated against Ms. Smith and she is entitled to compensation for these losses under 42 USC §1981A(b) and §24-34-405(3).

59. Ms. Smith is entitled to her attorney's fees and costs pursuant to §2000e-5(k) and §24-34-405(5).

### *Third Claim – Aiding and Abetting Discrimination and Retaliation*
### *against Defendant Haas*

60. Ms. Haas aided and abetted the defendant State in its racial and religious discrimination and retaliation against Ms. Smith. This violates Colorado's antidiscrimination act, §24-34-402(1)(e)(I).

61. Ms. Smith has been damaged by loss of income, emotional pain-and-suffering, humiliation, and inconvenience. Defendant intentionally discriminated against Ms. Smith and she is entitled to compensation for these losses under §24-34-405(3).

62. Ms. Haas engaged in her conduct with malice or reckless indifference to the rights of Ms. Smith and Ms. Smith is entitled to punitive damages against Ms. Haas pursuant to §24-34-405(3).

63. Ms. Smith is entitled to her attorney's fees and costs pursuant to §24-34-405(5).

WHEREFORE, plaintiff Tatyana Smith respectfully requests that this court enter judgment in her favor, together with interest, costs, attorney's fees, and such other relief as this court may deem proper.

Plaintiff requests trial to a jury.

Respectfully submitted this December 10, 2020.

*Duly Signed Original Available at the offices of:*

ROBERT M LIECHTY PC

By:   s/   *Robert M. Liechty*
Robert M. Liechty
ROBERT M LIECHTY PC
1800 Gaylord St.
Denver, Colorado 80206
Tel: (303) 861-5300
Fax: (303) 861-2746
Email:  rliechty@crossliechty.com
ATTORNEY FOR PLAINTIFF

Address of plaintiff:
12010 E. Canal Dr.
Aurora, CO 80011

16